**F. M. FERGUSON et al., Appellees,**

**v.**

**J H N CATTLE COMPANY, A Partnership Composed of Bryant A. Harris et al., Appellant.**

**No. 74–1052.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1974.

Decided Dec. 23, 1974.

Alan E. Peterson, Lincoln, Neb., for appellant.

James A. Lane, Ogallala, Neb., for appellees.

Before GIBSON, Chief Judge, CLARK, Associate Justice,* and WEBSTER, Circuit Judge.

Mr. Justice CLARK.

This diversity action, filed by appellees in the District of Nebraska, arises out of a cattle sale consummated on September 4, 1970, between (1) appellees Ford Ferguson, John Van Wambeck, and Glen Borneman (a group of Illinois businessmen who joined together to form Six Quarter Circle Cattle Co.);[1] (2) appellant J H N Cattle Co., a Texas partnership composed of Bryant Harris, Gene Newman, and George Jones; and (3) one Leslie Churchill, a disreputable Nebraska rancher, who was the intermediary in this transaction. In their complaint, appellees alleged that they had been fraudulently induced to enter into the cattle sale by appellant's misleading conduct and statements and that the cattle herd thus purchased proved to be some 227 head short of the bargained-for number. The jury awarded appellees $19,000 in damages against J H N Cattle Co. and the latter appeals.[2]

Appellant argues that the evidence before the jury was insufficient either to prove actual fraud by J H N itself under Nebraska law or to permit the fraudulent conduct of Churchill to be imputed to J H N under traditional agency concepts. Though we have reviewed the record and affirm, we think it appropriate to set forth the factual background of this transaction in some detail.

In May of 1970, Churchill offered to sell to J H N some 900 head of cattle located on his ranch in Nebraska, at a price of $160,000. Since J H N had been looking to expand its artificial insemination program, it accepted the offer and signed a contract of sale on May 15, 1970. It was agreed that the cattle were to be left on the ranch to graze under Churchill's care and that he was to repair the fences and corrals, to prepare other facilities necessary for the artificial insemination program, and to brand those cattle not already so identified.

The three partners who comprised J H N decided to artifically inseminate the cows during the summer. They contracted with Dr. Scott of Fort Collins, Colorado, to do the work, and James Kelley, an artificial insemination technician, was sent to the Churchill ranch to perform the insemination service. He first arrived at the Churchill ranch in June of 1970. Upon his arrival he noticed that the fences in the pasture to be used for J H N cattle were not in good repair and that a number of cattle appeared to be mingled with J H N cattle. He left the ranch to pick up equipment and a house trailer to move to the ranch. On about July 10 he returned to the ranch and noticed that the fences appeared to have been repaired. The J H N cattle were gathered into an area of about four sections which contained chutes and corrals for the insemination work. Kelley became aware at the time the work began that there did not appear to be 900 cattle in the pasture. He conducted a preliminary count and found 104 cattle to be missing. He immediate-

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. The name "Six Quarter Circle" derives from the cattle brand (a "6" over a quarter circle) registered to appellant and purchased by appellees simultaneous to the cattle sale.

2. Both Leslie Churchill and the Stockmen's National Bank of Rushville, Nebraska, whose vice-president Bennett Johnson acted as escrow agent and participated in the negotiations, were also named as defendants. A default judgment for $47,550 was entered against Churchill, while the jury found in favor of the bank at trial.

ly contacted Bryant Harris, one of the J H N partners. Harris told him to make a second count. A count was made, this time by penning and "chuting" the cattle, and all neighboring ranches and pastures were scoured for J H N cattle. This careful count showed the herd indeed to be 104 head short. Kelley so advised Harris, who immediately flew to Nebraska with Gene Newman, another of the partners, to investigate the shortage.

Prior to receiving these reports from Kelley, Harris had begun to be suspicious of Churchill's reliability and called the sheriff of Arthur County, Nebraska, to check up on him. From that call, Harris learned that Churchill did indeed have a reputation for dishonesty. Subsequently in late July when he received Kelley's report of the second count and flew to Nebraska, he called on Ed Williams, a local landowner from whom Churchill leased his ranch. Again, Harris was given a bad report on Churchill. During that same trip, Harris talked to a local attorney, A. R. Johnson, who told Harris that he suspected Churchill of moving cattle without authorization and that he had himself tried to get some hard evidence about the rancher's suspected illicit activities. Finally, during this July trip to Nebraska, Harris met with Churchill, who assured him that any shortage in the cattle was there on the ranch and promised that he and his boys would round them up and get them into the breeding pasture so they could be bred artificially. Somewhat mollified, Harris returned to Texas, but the bad reports continued.

On August 8, 1970, Harris and his partner, Gene Newman, flew to Nebraska to gather all the J H N cattle together and remove them to their ranch in Montana. When they informed Churchill of their intention, the latter offered to buy the cattle back at the original purchase price plus $20,000 for J H N's out-of-pocket expenses as well as some profit. Churchill wrote out a post-dated check to J H N for the $180,000 and a second one for $1,225 which represented interest and some miscellaneous expenses on the sale. The checks were deposited in J H N's bank in Marfa, Texas, on their due date but were not honored by Churchill's bank. Harris attempted to contact Churchill by phone to no avail.

While these events were transpiring, Churchill was engaged in negotiations that were soon to bring appellants and appellees into contact. In late August, Churchill had placed an advertisement in a cattleman's paper offering pasturage on a monthly fee basis. Borneman, who became one of the Six Quarter Circle joint venturers, called Churchill to inquire about the pasturage. During the conversation, Churchill mentioned that a Texas group owned some cattle that were grazing on Churchill's ranch and that they might be willing to sell them. Borneman expressed interest and, together with Ferguson, flew out to Nebraska at the end of August to inspect the herd. Either during or prior to this visit, Churchill called Harris, told him of Borneman's interest, and asked him if J H N would be willing to sell the cattle to the Illinois group. According to Churchill's testimony, Harris replied: "Sure, sell them."

It was agreed that the sale was to be closed at the Stockmen's National Bank on September 4, 1970, with Bennett Johnson, the Bank's Vice President, acting on behalf of Ferguson, Borneman, and Van Wambeck. Harris was notified of this arrangement, and flew to Nebraska on that date, picking up Churchill and going on to Rushville. He brought with him Churchill's two dishonored checks and a form for transferring J H N's brand, made out in blank. Enroute to Rushville, Harris returned the "hot" checks to Churchill. At the closing, it appears that Harris refused to sign a direct bill of sale to the Illinois group, preferring to give one to Churchill who could then, in turn, give one to Six Quarter. Banker Johnson telephoned Ferguson in Chicago, advising him of this development. Ferguson said he would not accept such a transfer and

asked to speak to Harris. The testimony as to what was said between Harris and Ferguson is disputed. According to Harris, he told Ferguson that J H N had already sold the cattle to Churchill sometime before and could not therefore give Six Quarter a bill of sale. Ferguson testified, on the other hand, that Harris told him that he didn't want to give a bill of sale direct to Six Quarter since "he hadn't been on the ranch for some time; there could be some fences down and some cattle out." The phone was then turned back over to Johnson, and Ferguson apparently told him that if he could get an endorsement indicating that the same cattle were being sold by J H N to Churchill and then to Six Quarter, he would accept the two bills of sale. Banker Johnson, however, testified that Ferguson did not request this on the telephone, but rather the request originated with Churchill after signing the bill of sale. In any event, Harris testified that he agreed to the endorsement.

Following the signing of the bills of sale, Harris completed the J H N brand transfer, which had previously been made out in blank, by filling in the name of Six Quarter and delivered it to Johnson. In return, Harris received a cashier's check for $180,000 from Johnson based on funds furnished by Six Quarter.

Late in September, the three partners of Six Quarter Circle began hearing rumors that Churchill might be selling off part of their herd. They made another trip to Nebraska, and upon inquiry found that Churchill had a poor reputation in and around Arthur and Ogallala, Nebraska, for integrity and dependability. It appeared that Churchill had sold a number of "slick" (unbranded) calves from the herd at the Thedford Livestock Market. The partners contacted Churchill and questioned him about shortages. He denied knowledge of any shortages. After the partners talked with a law office in Ogallala they returned to Chicago. In October, the herd was replevined and moved to another ranch. A count by the sheriff's office and three

livestock appraisers found the herd to be 237 cattle short, and this suit followed.

We turn now from our discussion of the background of the dispute to the merits of appellant's contentions. This case, of course, is controlled by the law of Nebraska where the transaction occurred. J H N asserts that Nebraska law requires both proof of intent to deceive by J H N and proof of justifiable reliance thereon by Six Quarter as necessary elements of a cause of action in fraud. Appellant argues that Harris' telephone conversation with Ferguson negates the possibility of an intent to deceive since he made it clear that he wasn't vouchsafing to Ferguson the accuracy of Churchill's bill of sale. Moreover, appellant argues that appellees had no justifiable right to rely on the bills of sale since Harris' statements were a "red flag" which would have caused any prudent businessman to look further.

Appellees respond that Harris knew that his bill of sale was off by at least 100 head of cattle and that Ferguson was going to be purchasing the cattle based on that document. Appellees deny that intent is an element of fraud in Nebraska, but, even if it is, assert that Harris' intent can be inferred from the totality of the circumstances.

We need not go into quiddities of Nebraska fraud law. We have examined the record and find the evidence quite sufficient for the jury to find all of the necessary elements assertedly required under state law. The jury could well believe that J H N, through Harris, knew that the herd to be sold to Six Quarter was short at least 104 head; nevertheless, J H N suppressed this information as well as information about Churchill's unreliability and gave a bill of sale to Churchill simultaneously with the latter's bill of sale to Six Quarter, both of which guaranteed the existence of 900 cattle in the herd. Furthermore, there was evidence which the jury might believe that Churchill was acting as an agent of J H N and that J H N was therefore responsible for his fraudulent actions. The jury appears to have re-

solved any conflicts in testimony regarding the September 4, 1970, transactions against appellant, and we therefore affirm.